| | |
|---|---|
| MITSUI O.S.K. LINES, LTD.,<br><br>    Plaintiff,<br><br>    - v -<br><br>EVANS DELIVERY COMPANY, INC., CHEETAH TRANSPORTATION, LLC, LIGHTNING TRANSPORTATION, INC., LAND TRANSPORTATION, FALCON TRANSPORT, INC., ATLANTIC TRUCKING COMPANY, INC., BRIDGE TERMINAL TRANSPORT, SEA LANE EXPRESS, INC., ST. GEORGE WAREHOUSE CO. OF GEORGIA, JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., TAB TRANSPORT, INC., SPIRIT TRUCKING COMPANY, GORNO TRANSPORTATION SERVICES, INC., ALL COAST INTERMODAL SERVICE, INC., ACE TRANSPORTATION, INC., TRANSPORT LEASING, INC., EMPIRE TRUCK LINES, INC., TRANSUS INTERMODAL, LLC, DOUBLE G TRANSPORTATION LLC, U.S. SERVICES, LLC, ROADLINK USA EAST, LLC, MIDWEST INTERMODAL SERVICES, INC., THE TRANSPORTER, INC.,<br><br>    Defendants. | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br><br>Civil Action No.<br>12-cv-05595 (KM) (MAH)<br><br><u>(Oral Argument Requested)</u> |

## BRIEF IN SUPPORT OF CERTAIN DEFENDANTS' MOTION TO DISMISS COMPLAINT

GEORGE W. WRIGHT & ASSOCIATES, LLC
Attorneys for Certain Defendants
505 Main Street, Suite 106
Hackensack, NJ 07601
(201) 342-8884

On The Brief:
George W. Wright, Esq.
Narinder S. Parmar, Esq.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES………………………………………..   ii

PRELIMINARY STATEMENT………………………………………   1

STATEMENT OF FACTS………………………………………..   1

LEGAL ARGUMENTS…………………………………………..   3

POINT I     THE COMPLAINT FAILS TO PLEAD
            MOL'S COMPLIANCE WITH THE
            180-DAY NOTICE REQUIREMENT
            WHICH IS A CONDITION PRECEDENT
            TO SUIT…………………………………………..   3

POINT II    PLAINTIFF'S CLAIMS ARE UNTIMELY………………   6

POINT III   SECTION 14705 APPLIES TO ALL
            SHIPMENTS AT ISSUE IN THIS ACTION ……………   6

POINT IV    THE DISCOVERY RULE RELIED ON
            BY PLAINTIFF IS PREEMPTED…………………………   7

POINT V     THE FAAAA STATUTE GIVES
            PLAINTIFF A BREACH OF CONTRACT
            CLAIM ONLY AND PREEMPTS
            ALL STATE LAW CLAIMS…………………………..   8

POINT VI    PLAINTIFF'S COMPLAINT AGAINST
            CERTAIN DEFENDANTS SHOULD BE
            DISMISSED BECAUSE THE COURT
            LACKS PERSONAL JURISDICTION
            OVER THEM…………………………………………   12

CONCLUSION……………………………………………………   17

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

<u>All World Prof'l Travel Servs. Inc. v. Am. Airlines, Inc.</u>, 282 F.Supp.2d
1161 (C.D. Cal. 2003)…………………………………………………………   10-11

<u>American Airlines, Inc. v. Wolens</u>, 513 U.S. 219, 115 S. Ct. 817,
130 L. Ed. 2d 715 (1995)……………………………………………………   9

<u>Artic Express v. Del Monte Fresh Produce NA, Inc.</u>, 366 B.R. 786
(S.D. Ohio 2007)……………………………………………………………   5

<u>Avery Dennison Corp. v. Con-Way Transportation Services, Inc.</u>,
2006 Ohio App. Lexis 6036…………………………………………………   3-4, 6

<u>Avdel Corporation v. Mecure</u>, 58 N.J. 264 (1971)………………………   13

<u>Barber Auto Sales, Inc. v. United Parcel Service, Inc.</u>, 494 F.Supp.2d 1290
(N.D. Ala. 2007)……………………………………………………………   5, 11

<u>Blakey v. Continental Airlines, Inc.</u>, 164 N.J. 38 (2000)…………………   16

<u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 105 S.Ct. 2174,
85 L.Ed.2d 528  (1985)……………………………………………………   14

<u>Cent. Transp. Int'l, Inc. v. Shuetz Container Sys., Inc.</u>, 2007 U.S. Dist.
Lexis 22801 (E.D.Mich. 2007)……………………………………………   5

<u>Cerdant, Inc. v. DHL Express USA, Inc.</u>, 2009 U.S. Dist. Lexis
27070, 2009 WL 723149 (S.D.Ohio 2009)………………………………   8, 11

<u>CGH Transp. Inc. v. Quebecor World, Inc</u> 2006 U.S. Dist. Lexis 22657
(E.D. Ky. 2006), affd. 261 Fed.Appx. 817 (6th Cir. 2008)…………………   5

<u>Chatelaine, Inc. v. Twin Modal, Inc.</u>, 737 F.Supp.2d 638,
2010 U.S.Dist. LEXIS 85894 (N.D.Tex. 2010)……………………………   10

<u>Data Mfg., Inc. v. United Parcel Service, Inc.</u>, 557 F.3d 849 (8th Cir. 2009)……..   11

<u>Deerskin Trading Post, Inc. v. United Parcel Service of America, Inc.</u>,
972 F.Supp. 665 (N.D.Ga. 1997)………………………………………..   9

Emmert Industrial Corp. v. Aristan Associates, Inc., 497 F.3d 982
(9th Cir. 2007)............................................................ 5

Frey v. Bekins Van Lines, Inc., 802 F.Supp. 2d 438 (E.D.N.Y. 2011)............. 10

Gendler & Co. v. Telecom Equip. Corp., 102 N.J. 460 (1986)................... 15

Great N. R. Co. v. Thompson, 222 F. Supp. 573 (D.N.D. 1963)................... 6-7

Grupp v. DHL Express (USA), Inc., 83 A.D.3d 1450, 922 N.Y.S.2d 888
(4th Dept. 2011)........................................................... 11

Hodges v. Delta Air Lines, Inc., 44 F.3d 334 (5th Cir. 1995)...................... 9

Huntington Operating Corp. v. Sybonney Express, Inc.,
2010 U.S.Dist. LEXIS 55591 (S.D.Tex. 2010)................................. 10

ICU Investigations, Inc. v. Simonik Moving & Storage, Inc.,
2009 Federal Carriers ¶84,624 (N.J. App.Div. 2009)................................ 11-12

Int'l. Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95
(1945)....................................................................... 13, 14

Kashala v. Mobility Svces. Intl., LLC, 2009 U.S.Dist. LEXIS 64334
(D.Mass. 2009)............................................................. 10

Lear Corporation v. LH Trucking, Inc. 2008 WL 2610239 (E.D. Mich. 2008).... 2, 5

Lebel v. Everglades Marina, Inc., 115 N.J. 317 (1989)............................... 16

Mastercraft Interiors, Ltd. v. ABF Freight Systems, Inc., 284 F.Supp.2d 284
(D.Md. 2003)............................................................... 10

Max Daetwyler Corp. v. Meyer, 762 F.2d 290, 295 (3d Cir.),
cert. denied, 474 U.S. 980, 106 S. Ct. 383, 88 L. Ed. 2d 336 (1985)............... 13

Morales v. Trans World Airlines, Inc., 504 U.S. 374, 112 S. Ct. 2031,
119 L. Ed. 2d 157 (1992).................................................... 9

Project Hope v. M/V IBN SINA, 250 F.3d 67 (2d Cir. 2001)...................... 6

Radiant Global Logistics, Inc. v. Cooper Wiring Devices, Inc.,
1:11-cv-4254-SCJ, Doc.39 (N.D.Ga. Sept. 21, 2012)................................ 11-12

Reliance Nat. v. Dana Transport, 376 N.J. Super. 537 (App. Div. 2005)............ 13

Rotella v. Wood, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed. 2d 1047 (2000)....... 7

Rowe v. New Hampshire Motor Transport Assn., 552 U.S. 364,
128 S. Ct. 989, 169 L. Ed. 2d 933 (2008)................................................. 8

Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683  (1977)... ........ 15

State of New Jersey v. Qwest Communications Intl. Inc., 387 N.J.Super.
487 (App. Div. 2006)............................................................................. 15-16

State of Texas v. Anderson, Clayton & Co., 92 F.2d 104 (5th Cir. 1937)........... 7

Stranahan Gear Co. v. N.L. Indus., Inc., 800 F.2d 53 (3rd Cir. 1986)................ 12

Thermal Techs., Inc. v. United Parcel Service., Inc. 2008 U.S. Dist.
Lexis 90243 (N.D. Okla. 2008)............................................................... 10

United States v. Brockamp, 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818
(1997)................................................................................................. 7

United States v. Erie R.R. Co., 280 U.S. 98, 50 S. Ct. 51, 74 L. Ed.
187 (1929)........................................................................................... 6

United Traffic Consultants, Inc. v. Gordon Trucking, Inc., 2003 WL 3300392
(D.Me. 2003)....................................................................................... 5

Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332,
87 L.Ed. 460 (1943)............................................................................. 6

Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106 (1994)........................ 14

World Wide Volkswagen v. Woodson, 444 U.S. 286, 100 S.Ct. 559,
62 L.Ed.2d 490 (1980).......................................................................... 13

Yellow Transportation, Inc. v. DM Transportation Mgmt. Svcs. Inc.,
2006 U.S. Dist. LEXIS 51231 (E.D.Pa. 2006)........................................... 10

## STATUTES

49 U.S.C. §13501……………………………………………………… 4

49 U.S.C. §13710……………………………………………………… 1, 3

49 U.S.C. §13907……………………………………………………….

49 U.S.C. §14501……………………………………………………… 1, 8

49 U.S.C. §14704……………………………………………………… 4-5

49 U.S.C. §14705……………………………………………………… 1, 4, 5, 7

49 U.S.C. §41713……………………………………………………… 8

Federal Aviation Administration Authorization Act of 1994
("FAAAA"), 108 Stat. 1605-1606…………………………………….. 

## COURT RULES

Fed.R.Civ.P. 12…………………………………………………………… 1

New Jersey Court Rule 4:4-4(b)(1)……………………………………… 3

## MISCELLANEOUS

Black's Law Dictionary, 1533 (4th Ed. 1968)…………………………… 8

Carolina Traffic Services of Gastonia, Inc. – Petition for Declaratory Order,
STB No. 41689, 1996 STB Lexis 189 (May 31, 1996)……………………… 4

H.R. Conf. Rep. No. 103-677, 103rd Cong., 2d Sess. 85 (1994),
reprinted in 1994 U.S.C.C.A.N. 715……………………………………… 8

National Assoc. of Freight Transp. Consultants, Inc. – Petition for Declaratory
Order, STB No. 41826, 1997 STB Lexis 2403 (Apr. 21, 1997)……………… 4

## PRELIMINARY STATEMENT

This Brief is respectfully submitted on behalf of defendants EVANS DELIVERY COMPANY, INC., LIGHTNING TRANSPORTATION, INC., FALCON TRANSPORT, INC., ATLANTIC TRUCKING COMPANY, INC., BRIDGE TERMINAL TRANSPORT, ST. GEORGE WAREHOUSE CO. OF GEORGIA, INC., JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., SPIRIT TRUCKING COMPANY, TRANSPORT LEASING, INC., EMPIRE TRUCK LINES, INC., US SERVICES, LLC and ROADLINK USA EAST, LLC in support of said defendants' motion for an Order:

(A)   pursuant to Fed.R.Civ.P. 12(b)(6) dismissing the Complaint for plaintiff's failure to: (1) comply with a condition precedent to suit by notifying defendants of a billing dispute within 180 days after MOL's receipt of defendants' disputed invoices pursuant to 49 U.S.C. 13710(a)(3)(B) and (2) file the Complaint within 18 months after delivery of the subject shipments pursuant to 49 U.S.C. 14705(b);

(B)   pursuant to Fed.R.Civ.P. 12(b)(6) dismissing all state law claims against defendants, including but not limited to all claims for alleged fraud, violation of the New Jersey Consumer Fraud Act, N.J.S.A, unjust enrichment and conversion as preempted by the "FAAAA" statute, The ICC Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 14501(c)(1); and

(C)   pursuant to Fed.R.Civ.P. 12(b)(2) dismissing the Complaint against defendants FALCON TRANSPORT, INC., ATLANTIC TRUCKING COMPANY, INC., ST. GEORGE WAREHOUSE CO. OF GEORGIA, INC., JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., SPIRIT TRUCKING COMPANY, EMPIRE TRUCK LINES, INC. and US SERVICES, LLC for lack of personal jurisdiction over said defendants.

## STATEMENT OF FACTS

The Complaint, dated June 27, 2012, alleges the following background facts:

(A)   Plaintiff MITSUI O.S.K. LINES, LTD. ("MOL"), is a Japanese corporation and a vessel operating ocean common carrier with an agent, MOL (America) Inc., located in Edison, New Jersey;

(B)   MOL utilized the transportation services of the above defendant motor carriers, commencing in or about <u>January, 2004 and continuing through in or about December, 2007</u>, to transport import shipments from various United States ports or rail yards to

1

destinations within the United States;

(C)    For each shipment, MOL's agent issued a transportation order ("TPO") to a defendant with the shipment's pick-up location, destination and the freight charge to be paid by MOL to the defendant for the shipment;

(D)    After delivering each shipment, the involved defendant motor carrier issued an invoice to MOL's agent according to MOL's TPO terms; and

(E)    MOL paid defendants' invoices pursuant to the TPO terms.

The Complaint alleges counts for alleged fraud and violation of the New Jersey Consumer Fraud Act against each defendant as follows:

(A)    In or around February 2011, MOL allegedly discovered that the defendant motor carriers had falsely reported to MOL that they had delivered the shipments to the destinations identified in MOL's TPO;

(B)    Instead of delivering the shipments to the destinations identified in MOL's TPOs, the defendant motor carriers allegedly delivered them instead to different locations;

(C)    "The rates paid by MOL for transportation to the fictitious destinations were higher than the rates that were applicable to the true destinations" and defendants allegedly "either retained the additional money and/or split it with others unlawfully;" and

(D)    MOL alleges it was overcharged hundreds of dollars per shipment by the defendant motor carriers.

The Complaint further alleges a count against each defendant for breach of contract on the ground that "Defendants...failed to deliver the cargo to the agreed destinations and yet accepted full freight for the activities." The Complaint further alleges a state law count against each defendant for unjust enrichment on the ground that "Defendants...have received payment from Plaintiff for transportation services which they agreed to provide, but which in fact did not provide." The Complaint further alleges a state law count against each defendant for conversion on the ground that "Defendant intentionally engaged in unauthorized or wrongful interference with

2

Plaintiff's possession and/or ownership rights in the cargo, by wrongfully diverting the cargo to unauthorized destinations."

## LEGAL ARGUMENTS

## POINT I

### THE COMPLAINT FAILS TO PLEAD MOL'S COMPLIANCE WITH THE 180-DAY NOTICE REQUIREMENT WHICH IS A CONDITION PRECEDENT TO SUIT

The gist of MOL's Complaint is that defendants overcharged plaintiff for transportation services. "The plain and ordinary meaning of the term overcharge is "to charge too much or too fully." Lear Corporation v. LH Trucking, Inc. 2008 WL 2610239, *10 (E.D. Mich. 2008). The Complaint fails to state viable overcharge claims against defendants because the Complaint fails to allege that it notified defendants of a billing dispute within 180 days after plaintiff's receipt of the disputed invoices. Such timely notification is a statutory condition precedent to recovery under 49 U.S.C. Sec. 13710(a)(3)(B) which is commonly referred to as the "180-day Rule." Section 13710(a)(3)(B) states:

Additional billing and collecting practices

(a)   Miscellaneous Provisions.

(3)   Billing disputes.

(B)  Initiated by shippers. – If a shipper seeks to contest the charges originally billed or additional charges subsequently billed, the shipper may request that the [Surface Transportation] Board  determine whether the charges billed must be paid.  A shipper must contest the original bill or subsequent bill within 180 days of receipt of the bill in order to have the right to contest such charges.

"A shipper loses any right to contest charges (whether before the Board, in court or both) if it does not notify the carrier of its disagreement within 180 days of receiving he disputed bill, as required by Section 13710(a)(3)(B)." Avery Dennison Corp. v. Con-Way Transportation

3

Services, Inc., 2006 Ohio App. Lexis 6036, *10-11[citing Carolina Traffic Services of Gastonia, Inc. – Petition for Declaratory Order, STB No. 41689, 1996 STB Lexis 189 (May 31, 1996).

According to the United States Department of Transportation, Surface Transportation Board ("STB"), the 180-day Rule is a condition precedent to a suit for freight overcharges. "This notification requirement must be met in order for the carrier or shipper to have a 'right' of action." Id. The STB explained that the 180-day rule applies to all billing disputes between shippers and motor carriers. Avery, supra [citing National Assoc. of Freight Transp. Consultants, Inc. – Petition for Declaratory Order, STB No. 41826, 1997 STB Lexis 2403 (Apr. 21, 1997)].

As the Complaint fails to allege that MOL contested defendants' disputed freight charge invoices within 180 days after receipt, the Complaint must be dismissed.

## POINT II

## PLAINTIFF'S CLAIMS ARE UNTIMELY

The Complaint was not filed within 18 months after MOL's claims allegedly accrued. Title 49 U.S.C. Sec. 14705, states, in pertinent part:

§ 14705. Limitation on actions by and against carriers

(a) In general. A carrier providing transportation or service subject to jurisdiction under chapter 135 [49 U.S.C. §§ 13501, et seq.] must begin a civil action to recover charges for transportation or service provided by the carrier within 18 months after the claim accrues.

(b) Overcharges. A person must begin a civil action to recover overcharges within 18 months after the claim accrues. If the claim is against a carrier providing transportation subject to jurisdiction under chapter 135 [49 U.S.C. §§ 13501, et seq.] and an election to file a complaint with the Board or Secretary, as applicable, is made under section 14704(c)(1) [49 USCS § 14704(c)(1)], the complaint must be filed within 3 years after the claim accrues.

(c) Damages. A person must file a complaint with the Board or Secretary, as applicable, to recover damages under section

4

14704(b) [49 U.S.C. § 14704(b)] within 2 years after the claim accrues.

\* \* \*

(g) Accrual date. A claim related to a shipment of property accrues under this section on delivery or tender of delivery by the carrier.

Plaintiff's claims are governed by Section 14705(b) because they allege freight overcharges by defendants.   Lear Corporation v. LH Trucking, Inc. 2008 WL 2610239, \*10 (E.D. Mich. 2008) involved facts analogous to those at bar.  LH Trucking allegedly charged Lear Corp. for multi-stop shipments as separate trips, resulting in Lear's claim that it was billed for more miles than were actually covered by LH Trucking.  Id. at \*2.  The Court held that the defendant's practice amounted to overcharging and, thus, the plaintiff's failure to file suit within 18 months resulted in the claimed overcharges being time-barred.  Id. at \*10.  In Barber Auto Sales, Inc. v. United Parcel Service, Inc., 494 F.Supp.2d 1290 (N.D. Ala. 2007), the plaintiff alleged that UPS billed excessive shipping charges based on false package dimensions.  Id. at 1292.  The District Court held that "the 18 month limitations period set out in §14705(b) applies to Barber's state law breach of contract claim" Id. at 1295.

The courts have consistently held that Section 14705 applies to all claims "by or against carriers" concerning freight charges, including all state law claims.  See Emmert Industrial Corp. v. Aristan Associates, Inc., 497 F.3d 982 (9th Cir. 2007) [holding Section 14705(a), the corollary limitation period for claims by carriers to recover charges from shippers, barred both state law and federal claims]; Artic Express v. Del Monte Fresh Produce NA, Inc., 366 B.R. 786, 793 (S.D. Ohio 2007); Cent. Transp. Int'l, Inc. v. Shuetz Container Sys., Inc., 2007 U.S. Dist. Lexis 22801, \*20-22 (E.D.Mich. 2007);  CGH Transp. Inc. v. Quebecor World, Inc. 2006 U.S. Dist. Lexis 22657, \*5 (E.D. Ky. 2006), affd. 261 Fed.Appx. 817 (6th Cir. 2008); United Traffic Consultants, Inc. v. Gordon Trucking, Inc., 2003 WL 3300392, \*3 (D.Me. 2003);

5

Avery Dennison Corp., v. Con-Way Transp. Servs. Inc., 2006 Ohio App. Lexis 6036, **4-5, **7-8 (Ohio Ct. App. 2006).

Plaintiff alleges that defendants' transportation services were rendered between 2004 and 2007, well over 18 months before the Complaint was filed on July 2, 2012. Therefore, the Complaint is time-barred and should be dismissed.

**POINT III**

**SECTION 14705 APPLIES TO ALL
SHIPMENTS AT ISSUE IN THIS ACTION**

The Complaint alleges that MOL utilized defendants' transportation services to transport goods from various United States ports or rail yards to inland destinations within the United States.

As the subject shipments are alleged to have moved in interstate commerce, Section 14705's 18-month limitation period applies to all shipments at issue in this action, whether defendants hauled them between different states or entirely within a state. See, Walling v. Jacksonville Paper Co., 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1943) [the interstate commerce requirement is satisfied if the goods being transported are involved in a "practical continuity of movement" in the flow of interstate commerce]; Project Hope v. M/V IBN SINA, 250 F.3d 67, 74 (2d Cir. 2001) ["the [interstate] nature of a shipment is...determined...by the essential character of the commerce, reflected by the intention formed prior to shipment, pursuant to which the property is carried to a selected destination by a continuous or unified movement" (emphasis added)]. The nature of a shipment is not determined by a mechanical inspection of the bill of lading nor by when and to whom title passes but rather by "the essential character of the commerce," United States v. Erie R.R. Co., 280 U.S. 98, 102, 50 S. Ct. 51, 53, 74 L. Ed. 187, 206 (1929), reflected by the "intention formed prior to shipment, pursuant to which property is carried to a selected destination by a continuous or unified movement," Great

6

N. R. Co. v. Thompson, 222 F. Supp. 573, 582 (D.N.D. 1963).  See also, State of Texas v. Anderson, Clayton & Co., 92 F.2d 104, 107 (5th Cir. 1937) [where shipper exporting cotton shipped it locally from Rochester, Texas to port of Houston for export, shipment held not to be intrastate in character], cert. denied, 302 U.S. 747, 58 S. Ct. 265, 82 L. Ed. 578 (1937).

All MOL shipments alleged in the Complaint to have been transported by defendants were "interstate" in nature.  Therefore, plaintiff's overcharge claims are barred by Section 14705(b).

## POINT IV

### THE DISCOVERY RULE RELIED ON BY PLAINTIFF IS PREEMPTED

Defendants' freight invoices were allegedly remitted to plaintiff during 2004 to 2007.  The Complaint avers that plaintiff did not discover the alleged overcharges until February, 2011.  Equitable tolling does not apply to this action because Section 14705(b) is part of a federal statutory scheme with respect to which "Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute that it wrote."  United States v. Brockamp, 519 U.S. 347, 352, 117 S.Ct. 849, 852, 136 L.Ed.2d 818, 823 (1997) [holding that I.R.S. time limitations for seeking reimbursement of tax overpayments cannot be equitably tolled[1]].  The discovery rule is unavailable to plaintiff because the federal courts only apply "a discovery accrual rule when a statute is silent" as to claim accrual.  Rotella v. Wood, 528 U.S. 549, 555, 120 S.Ct. 1075, 1081, 145 L.Ed. 2d 1047, 1055 (2000).  Section 14705(g) plainly states that a "claim accrues under this section on delivery or tender of delivery by the carrier"

---

[1] In apparent response to Brockamp, in 1998 Congress enacted a narrow statutory exception to the time limitations applicable to any period during which a taxpayer is financially disabled. Pub. L. 105-206, § 3202(a), 112 Stat. 685 (codified at 26 U.S.C. § 6511(h)(1)).  To date, no other exception to the Brockamp rule has been enacted.

(emphasis added). Therefore, the date when plaintiff purportedly discovered the alleged overcharges is inconsequential.

<b><u>POINT V</u></b>

<b>THE FAAAA STATUTE GIVES PLAINTIFF<br>A BREACH OF CONTRACT CLAIM ONLY<br><u>AND PREEMPTS ALL STATE LAW CLAIMS</u></b>

The ICC Termination Act of 1995 ("ICCTA"), 49 U.S.C. §§101, et. seq. ICCTA Section 14501(c)(1) provides, in part, "A State ... may not enact or enforce a law ... related to a price, route, or service of any carrier ... with respect to the transportation of property." Section 14501(c)(1) is commonly referred to as ICCTA's so-called "FAAAA" preemption clause because it adopts virtually identical language contained in the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 108 Stat. 1605-1606, and the Airline Deregulation Act of 1978 ("ADA"); 49 U.S.C. §41713(b)(4)(A) and (b)(4)(B)(i).

Congress's enactment of Section 14501 was explicitly based on the same language governing air carriers set forth in the FAAAA at 49 U.S.C. Section 41713(b)(4)(A) and was "intended to function in the exact same manner with respect to its preemptive effects." H.R. Conf. Rep. No. 103-677, 103rd Cong., 2d Sess. 85 (1994), reprinted in 1994 U.S.C.C.A.N. 715, 757. In Rowe v. New Hampshire Motor Transport Assn., 552 U.S. 364, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008), the Supreme Court held that the ADA's broad preemptive scope applies with equal force to ICCTA Section 14501(c)(1); Cerdant, Inc. v. DHL Express USA, Inc., 2009 U.S. Dist. Lexis 27070, *11-12, 2009 WL 723149, at *4 (S.D.Ohio 2009) [collecting cases].

ICCTA's FAAAA preemption clause broadly bars state regulation of, and state law causes of action against, interstate and intrastate motor carriers with respect to their prices, routes and services. "Service" is defined in the context of contracts as "duty or labor to be rendered by one person to another...." Black's Law Dictionary, 1533 (4th Ed. 1968). "'Services'

8

generally represent a bargained-for or anticipated provision of labor from one party to another…" Hodges v. Delta Air Lines, Inc., 44 F.3d 334, 336 (5th Cir. 1995).

The United States Supreme Court held in Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) that the ordinary meaning of the statutory phrase "relating to services" is "… a broad one -- 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with…" and that these words "express a broad pre-emptive purpose" (emphasis added). The High Court further held that that preemption may occur even if a state law's effect on rates, routes, or services "is only indirect," or if the state law is not specifically targeted at the industry or subject area preempted, and it makes no difference whether a state law is consistent or inconsistent with federal regulation. Id. at 386-387.

Preemption occurs where state laws have a "significant impact" related to Congress's deregulatory and preemption-related objectives. Id. at 390. The Morales Court noted that Congress's goal is to ensure transportation rates, routes, and services that reflect "maximum reliance on competitive market forces," thereby stimulating "efficiency, innovation, and low prices," as well as "variety" and "quality." Id. at 378.

The Supreme Court similarly held in American Airlines, Inc. v. Wolens, 513 U.S. 219, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995) that the ADA preempts actions against air carriers under state consumer protection statutes. Wolens held that the ADA preempted claims alleging that an airline's frequent flyer program was a deceptive practice under state law. 513 U.S. at 226. Wolens mandates dismissal of all plaintiff's state law counts against defendants, including its New Jersey Consumer Fraud Act claims.

In Deerskin Trading Post, Inc. v. United Parcel Service of America, Inc., 972 F.Supp. 665, 674 (N.D.Ga. 1997) the District Court, following Wolens, held that the FAAAA

statute preempts "…all state law causes of action relating to an airline's rates, routes for services except for routine breach of contract actions with no enlargement or enhancement based on state laws or policies external to the agreement (emphasis original) [citing Wolens, supra].

      Numerous federal courts have dismissed under the FAAAA preemption doctrine state law claims affecting the prices or services provided by interstate motor carriers. See, Frey v. Bekins Van Lines, Inc., 802 F.Supp. 2d 438 (E.D.N.Y. 2011) [dismissing New York state consumer law claims against household goods carriers for alleged freight charge "low-balling"]; Chatelaine, Inc. v. Twin Modal, Inc., 737 F.Supp.2d 638, 639-643, 2010 U.S.Dist. LEXIS 85894 (N.D.Tex. 2010) [holding state law claims against freight broker for negligence, negligent hiring and deceptive trade practices preempted by Section 14501]; Huntington Operating Corp. v. Sybonney Express, Inc., 2010 U.S.Dist. LEXIS 55591 at *6 (S.D.Tex. 2010) [dismissing state law claims against freight broker alleging deceptive trade practices, negligence and negligent misrepresentation based on Section 14501(c)(1) preemption]; Kashala v. Mobility Svces. Intl., LLC, 2009 U.S.Dist. LEXIS 64334 (D.Mass. 2009) [dismissing negligence claim against freight broker for alleged cargo damage]; Yellow Transportation, Inc. v. DM Transportation Mgmt. Svcs. Inc., 2006 U.S. Dist. LEXIS 51231 (E.D.Pa. 2006) [holding motor carrier's state law claims against freight broker alleging misrepresentation, unjust enrichment, quantum meruit, fraud and unlawful discounts preempted by FAAAA]. Mastercraft Interiors, Ltd. v. ABF Freight Systems, Inc., 284 F.Supp.2d 284, 288 (D.Md. 2003) [holding tort claims of misrepresentation, negligent misrepresentation, unjust enrichment and punitive damages preempted by ICCTA]; Thermal Techs., Inc. v. United Parcel Service., Inc. 2008 U.S. Dist Lexis 90243 (N.D. Okla. 2008) [dismissing unjust enrichment claim under FAAA]; All World Prof'l Travel Servs. Inc. v. Am. Airlines, Inc., 282 F.Supp. 2d 1161, 1169 (C.D. Cal. 2003) [finding that claims for unjust

enrichment and declaratory and injunctive relief are preempted if the claims relate to prices or services].

FAAAA preemption has been held to require dismissal of state law claims arising from billing disputes involving interstate transportation services.  In Data Mfg., Inc. v. United Parcel Service, Inc., 557 F.3d 849 (8th Cir. 2009), the plaintiff alleged that UPS improperly assessed a $10.00 charge for each shipment billed to plaintiff under its customer account.  Id. at 81.  The Eighth Circuit held plaintiff's state law claims against UPS for fraud and negligent misrepresentation preempted by the FAAAA.

In Barber Auto Sales, Inc. v. United Parcel Service, Inc., 494 F.Supp.2d 1290 (N.D.Ala. 2007) the Court similarly dismissed the plaintiff's state law equitable relief claims against UPS as FAAAA-preempted.  The suit alleged that UPS improperly invoiced the plaintiff for excessive shipping charges based on false package dimensions.  The plaintiff sought money damages for breach of contract, rescission of the shipping contracts and an injunction prohibiting UPS from assessing further overcharging the plaintiff.  Id. at 1292.  The Court reasoned that granting the plaintiff injunctive relief would amount to an enlargement or enhancement of the parties' contract rights and, thus, such relief was preempted.  Id. at 1294.  See also, Grupp v. DHL Express (USA), Inc., 83 A.D.3d 1450, 922 N.Y.S.2d 888 (4th Dept. 2011) [dismissing a qui tam action alleging DHL's overbilling as preempted by the ADA and FAAAA]; Cerdant, Inc. v. DHL Express (USA), Inc. 2009 WL 723149 (S.D. Ohio 2009) [dismissing as preempted state law claims alleging DHL billed customers for shipments for which they generated waybills using DHL's website, but the goods were not actually tendered to DHL].

See also, Radiant Global Logistics, Inc. v. Cooper Wiring Devices, Inc., 1:11-cv-4254-SCJ, Doc.39 (N.D.Ga. Sept. 21, 2012) [fraud and Georgia Fair Business Practices Act claims against property freight broker for allegedly inflated rates held preempted by FAAAA];

ICU Investigations, Inc. v. Simonik Moving & Storage, Inc., 2009 Federal Carriers ¶84,624 (N.J. App.Div. 2009) [affirming dismissal of New Jersey Consumer Fraud Act and class action claims against intrastate household goods carrier for alleged deceptive underestimation of charges]. Copies of the decisions in Radiant Global and ICU Investigations are annexed hereto as Exhibits "1" and "2."

Plaintiff's freight overcharge claims against defendants directly relate to their prices and services within the meaning of the FAAAA statute. Accordingly, all state law claims against defendants, except for breach of contract, should be dismissed.

## POINT VI

### PLAINTIFFS' COMPLAINT AGAINST CERTAIN DEFENDANTS SHOULD BE DISMISSED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER THEM

The Court lacks personal jurisdiction over defendants FALCON TRANSPORT, INC., INC., ATLANTIC TRUCKING COMPANY, INC., ST. GEORGE WAREHOUSE CO. OF GEORGIA, INC., JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., SPIRIT TRUCKING COMPANY, EMPIRE TRUCK LINES, INC. and US SERVICES, LLC because they do not have sufficient minimum contacts with New Jersey. It is a plaintiff's burden to demonstrate a basis for personal jurisdiction in response to a challenge by a defendant. Stranahan Gear Co. v. N.L. Indus., Inc., 800 F.2d 53, 58 (3rd Cir. 1986). Plaintiff cannot establish a basis for personal jurisdiction over FALCON TRANSPORT, INC., ATLANTIC TRUCKING COMPANY, INC., ST. GEORGE WAREHOUSE CO. OF GEORGIA, INC., JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., SPIRIT TRUCKING COMPANY, EMPIRE TRUCK LINES, INC. and US SERVICES, LLC. Therefore, the Complaint should be dismissed against them.

Personal jurisdiction must be determined according to the law of the forum state. Max Daetwyler Corp. v. Meyer, 762 F.2d 290, 295 (3d Cir.), cert. denied, 474 U.S. 980, 106 S. Ct. 383, 88 L. Ed. 2d 336 (1985). New Jersey Court Rule 4:4-4(b)(1) vests New Jersey courts with jurisdiction over non-residents to the outer limits permitted by due process. Avdel Corporation v. Mecure, 58 N.J. 264, 268 (1971) ["In other words, we will allow out-of-state service to the uttermost limits permitted by the United States Constitution…In determining those limits we look first to the rulings of the United States Supreme Court"]; Reliance Nat. v. Dana Transport, 376 N.J. Super. 537, 543 (App. Div. 2005).

In the seminal case of Int'l. Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the United States Supreme Court set out the parameters of personal jurisdiction under the due process clause, holding that due process requires a defendant who does not have a presence in the forum must have certain minimum contacts with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Id. Minimum contacts require, "that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws. Id. at 319.

The United States Supreme Court later explained that the "minimum contacts" test serves two purposes. World Wide Volkswagen v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The first is to protect a defendant against litigating in an inconvenient forum which requires that "maintenance of the suit 'not offend traditional notions of fair play and substantial justice." Id. at 291-292. The second is to ensure that states do not exceed their jurisdictional limits under the federal system. Id. The latter policy "has been relaxed substantially over the years" because of the "fundamental transformation in the American

economy." Id. at 292-293.   The minimum contacts test is the preliminary requirement for establishing jurisdiction under the due process analysis. Id. at 294.

Essential to the minimum contacts requirement of the due process analysis is whether the defendant should reasonably anticipate being sued in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).   The record must show that the defendant has purposefully availed itself of the privilege of engaging in activities within the forum state, thereby gaining the benefits and protections of its laws. Id. at 475. Thus, defendants are protected from being "haled into court" in a foreign jurisdiction solely on the basis of random, fortuitous, or attenuated contacts or as a result of the unilateral activity of another party. Id.

Only if the court finds that a defendant has purposefully established minimum contacts within the forum state can it proceed to the next requirement of the due process analysis. The second requirement analyzes other factors, including the state's interest in adjudicating the lawsuit and the plaintiff's interest in obtaining relief which is weighed against the sufficiency of the contacts to determine if jurisdiction would be consistent with the notion of fair play and substantial justice.   Those factors may even "serve to establish the reasonableness of jurisdiction upon a lesser showing of jurisdiction that otherwise would be required." Id. at 477.

In accordance with Int'l. Shoe Co., and its progeny, the New Jersey courts apply the minimum contacts test to determine whether jurisdiction exists over a non-resident defendant.   The New Jersey test requires a case-by-case, two-part analysis of a defendant's relationship with the forum state to satisfy the jurisdictional requirements of due process. Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 122 (1994).   The first part is to determine if minimum contacts exist at all. Id.   This ensures that a state's grasp does not exceed its jurisdictional reach while protecting the primary goal of ensuring that a defendant is not subject

14

to a judgment in a state with which it has no minimum contact. Id. [citing Gendler & Co. v. Telecom Equip. Corp., 102 N.J. 460, 471 (1986)]. The second part is reached only if minimum contacts exist. Id. at 124. Only if there are minimum contacts may the court weigh the sufficiency of the contacts against the relationship between the defendant, the forum state and the litigation. Id. at 123 [citing Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)].

Minimum contacts may exist through "general jurisdiction" or "specific jurisdiction. Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322-23 (1989). General jurisdiction subjects the defendant to suit on virtually any claim, even if unrelated to the defendant's contacts with the forum, but is unavailable unless the defendant's activities in the forum state can be characterized as "continuous and systematic" contacts. Id. Here, it is clear that defendants have no meaningful connections to New Jersey independent of the submission of the subject invoices to plaintiff's U.S. subsidiary's New Jersey office.

The issue is whether defendants' mere transmittal of invoices to MOL's agent's New Jersey office is sufficient to subject them to the "specific jurisdiction" of the New Jersey courts. In the context of specific jurisdiction, the minimum contacts inquiry must focus on the "relationship among the defendant, the forum, and the litigation." Id. The minimum contacts requirement is satisfied if the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff. Id. In an alleged misrepresentation case like this one,[2] the New Jersey courts have held that "intentional miscommunication of information with knowledge or purpose that it will cause harm in this State, suffices to establish the requisite minimum contacts." State of New Jersey v. Qwest Communications Intl. Inc., 387 N.J.Super.

---

[2] Although plaintiff alleges fraud, violation of the New Jersey Consumer Fraud Act, unjust enrichment and conversion, these counts are preempted by the FAAAA statute as discussed in Point V above.

487, 499 (App. Div. 2006); see also Lebel v. Everglades Marina, Inc., 115 N.J. 317, 324-325 (1989) [holding Florida defendant who telephoned New Jersey buyer to work out contract details, mailed contract to New Jersey, received payment from New Jersey and allegedly made fraudulent representations, had sufficient contacts to establish jurisdiction]; Blakey v. Continental Airlines, Inc., 164 N.J. 38 (2000) [defendants allegedly publishing defamatory electronic messages with knowledge they would be published in New Jersey held subject to New Jersey jurisdiction].

In the instant case, no harm was directed at or caused to any New Jersey resident. Plaintiff is a Japanese corporation that has no New Jersey presence of its own, besides its agent's office. The subject invoices were allegedly sent to MOL's agent in New Jersey, however, MOL's agent is not a party to this action. Plaintiff's decision to use its New Jersey agent to receive defendants' invoices, instead of having defendants send them to MOL's offices in Japan, is entirely fortuitous. As the subject shipments did not involve New Jersey, defendants' connection to New Jersey with respect to the underlying facts is tenuous at best. Furthermore, to the extent plaintiff's fraud claims are completely preempted by federal law, defendants' alleged conduct giving rise to preempted claims should not be considered with respect to a "minimum contacts" analysis.

Under these circumstances, the exercise of jurisdiction over defendants FALCON TRANSPORT, INC., ATLANTIC TRUCKING COMPANY, INC., ST. GEORGE WAREHOUSE CO. OF GEORGIA, INC., JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., SPIRIT TRUCKING COMPANY, EMPIRE TRUCK LINES, INC. and US SERVICES, LLC would not comport with "fair play and substantial justice."

## CONCLUSION

Defendants EVANS DELIVERY COMPANY, INC., LIGHTNING TRANSPORTATION, INC., FALCON TRANSPORT, INC., ATLANTIC TRUCKING COMPANY, INC., BRIDGE TERMINAL TRANSPORT, ST. GEORGE WAREHOUSE CO. OF GEORGIA, INC., JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., SPIRIT TRUCKING COMPANY, TRANSPORT LEASING, INC., EMPIRE TRUCK LINES, INC., US SERVICES, LLC and ROADLINK USA EAST, LLC respectfully request that the Court dismiss the Complaint against said defendants for failure to state claims against them on which relief may be granted. Defendants FALCON TRANSPORT, INC., ATLANTIC TRUCKING COMPANY, INC., ST. GEORGE WAREHOUSE CO. OF GEORGIA, INC., JACK FREEMAN TRUCKING CO., INC., LARRY'S CARTAGE CO., INC., SPIRIT TRUCKING COMPANY, EMPIRE TRUCK LINES, INC. and US SERVICES, LLC further respectfully request that the Court dismiss the Complaint against them for lack of personal jurisdiction.

Dated:  September 28, 2012

Respectfully submitted,

GEORGE W. WRIGHT

# EXHIBIT "1"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RADIANT GLOBAL LOGISTICS,
INC. d/b/a DISTRIBUTION BY AIR,

    Plaintiff,

        v.

COOPER WIRING DEVICES, INC.,

    Defendant.

CIVIL ACTION
No. 1:11-cv-4254-SCJ

## O R D E R

This contract action is before the Court on Plaintiff's motion to dismiss counterclaims [Doc. No. 7].

## I.    BACKGROUND

Radiant Global Logistics Inc. (d/b/a Distribution By Air (DBA)), a federally licensed property broker, is in the business of arranging for the interstate and intrastate transportation of shipments by motor carrier. According to the complaint, Cooper Wiring Devices, Inc. (Cooper) contracted with DBA for the transportation of 2,294 intrastate and interstate shipments. Allegedly, Cooper agreed to the contract conditions by arranging for the tendering of the shipments to DBA. Cooper was responsible to DBA for the freight charges incurred, and DBA invoiced Cooper for charges in the amount of $921,016.85. Cooper, however, failed to make

payments on those charges. DBA filed the instant action seeking to recoup its loss of $921,016.85. Cooper counterclaimed alleging that the total amount charged was unreasonable as it was more than 225 percent above the rate usually agreed upon between Cooper and DBA and grossly above the customary rate in the industry for similar services. It also alleged that the tariff charge by DBA was excessive. According to Cooper, it was invoiced a total of $1,177,796 by DBA, of which it paid $343,789.03. It requests that the Court determine a reasonable rate to be applied to calculate any amount that remains due and that, to the extent the application of a reasonable rate reveals that DBA is entitled to an amount less than that which has already been paid by Cooper, DBA be required to return that amount. Cooper asserts the following causes of action in its Counterclaim: Unreasonable Practices and Unreasonable Tariff Rate (Count I), Fraud and Misrepresentation (Count II), Violation of the Georgia Fair Business Practices Act (Count III), Attorney's Fees and Costs (Count IV), and Breach of Contract (Count V).[1] DBA seeks the dismissal of Counts I through IV of Cooper's Counterclaim, arguing that those claims are preempted by the Federal Aviation Administration Authorization Act of 1994 as

---

[1] The breach of contract claim was not included in the original Counterclaim [Doc. No. 6]. Cooper later amended its Counterclaim to assert the claim [Doc. No. 10].

-2-

amended by the Interstate Commerce Commission Termination Act of 1995 (ICCTA).

## II.   LEGAL STANDARD

A complaint may be dismissed if the facts as pled do not state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (explaining "only a complaint that states a plausible claim for relief survives a motion to dismiss"); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561–62, 570 (2007) (retiring the prior *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), standard which provided that in reviewing the sufficiency of a complaint, the complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In *Iqbal*, the Supreme Court reiterated that although Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." 129 S. Ct. at 1949.

In *Twombly*, the Supreme Court emphasized a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations and emphasis omitted).

The court, at the motion to dismiss stage, accepts all well-pleaded facts as true and construes all reasonable inferences from the facts "in the light most favorable to the plaintiff." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006).

## III. ANALYSIS

ICCTA contains a broad preemption provision significantly curtailing state authority to regulate transportation by motor carriers. 49 U.S.C. § 14501. Particularly relevant here is the preemption provision concerning motor carriers of property. Section 14501(c)(1) proscribes a state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker,[2] or freight forwarder with respect to the transportation of property." While the preemption provision of § 14501(b)(1), relating to freight forwarders and brokers, is specifically addressed to state laws regarding intrastate transport rates, routes,

---

[2] A broker is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that . . . sells, offers for sale, negotiates for, or holds itself out . . . as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). DBA is not a motor carrier and is in the business of arranging for transportation by motor carrier for compensation. Accordingly, DBA is a broker under ICCTA.

-4-

and services, the prohibition in § 14501(c)(1) does not contain that limitation.  In *Deerskin Trading Post, Inc. v. United Parcel Service of Am., Inc.*, 972 F. Supp. 665, 668 (N.D. Ga. 1997), this Court concluded that the use of the phrase "related to" in § 14501(c)(1) evinces a congressional intent to provide for preemption that was "broad in scope" so as to "preclude[] any state enforcement action having a connection with or reference to any price, route, or service of any motor carrier." In *Deerskin*, this Court concluded that "state law tort action against a carrier, where the subject matter of the action is related to the carrier's price, routes, or service, is a state enforcement action" under § 14501(c)(1) and, as such, is preempted.  972 F. Supp. at 672.  Accordingly, the Court dismissed all of the plaintiff's state law tort claims as "[t]he subject matter of all of Plaintiff's claims relate[d] to prices charged by Defendant for various services and thus all of Plaintiff's claims . . . impose[d] state laws, standards, and policies external to any agreement between Plaintiff and Defendant on Defendant's conduct relating to its pricing practices." *Id.* The *Deerskin* plaintiff's breach of contract claim survived, however, as "courts are permitted to hold the parties to the contract to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement."  *Id.* at 672–73 (internal quotation marks omitted).  Other courts have similarly held that

state law tort claims are preempted under § 14501(c)(1). For example, in *Huntington Operating Corp. v. Sybonney Exp., Inc.*, No. H–08–781, 2011 WL 1930087 (S.D. Tex. May 11, 2010), the court granted summary judgment to the defendant, a transportation broker who arranged for the shipment of the plaintiff's product by a motor carrier, on the plaintiff's tort claims and its claim under the Texas Deceptive Trade Practices Act upon concluding that § 14501 preempted state law claims that would, in effect, regulate the transportation of goods. *See also Frey v. Bekins Van Lines, Inc.*, 802 F. Supp. 2d 438 (E.D.N.Y. 2011) (concluding that "ICCTA preemption clause bar[red] Plaintiff's state law claims" for fraud, negligence, and the violation of state consumer protection law against the defendant motor carrier); *Yellow Transp., Inc. v. DM Transp. Mgmt. Servs.*, No. Civ.A.2:06CV1517-LDD, 2006 WL 2871745 (E.D. Pa. July 14, 2006) (plaintiff's tort claims alleging rate manipulation by a freight broker preempted by ICCTA).

Cooper's argument that its state law claims are not preempted under ICCTA is unavailing. According to Cooper, its claims "go beyond simply the rate, price, route, or service that [DBA] provided for transportation" and encompass DBA's "conduct in its billing or invoicing practices, as well as possible conduct in [DBA's] charges going beyond transportation rates, prices, or services" [Doc. No. 13, 5]. The

Court is not persuaded. The crux of Cooper's Counterclaim is that DBA charged Cooper an allegedly inflated rate for shipment, a rate that did not reflect the understanding between the parties based upon their prior relationship. Cooper's state law claims are grounded in that allegation, which is directly related to the "price . . . or service . . . of a broker . . . with respect to the transportation of property. § 14501(c)(1). Accordingly, Cooper's state law claims are preempted. A review of the Counterclaim reveals no facts supporting Cooper's contention that its claims go beyond the rate, price, or service that DBA provided. To the extent Cooper alleges facts bringing into question DBA's invoicing and billing practices, considering the broad scope of the preemption provision at issue, such claims under state law are also preempted as "related to" DBA's price or service.

Equally unavailing is Cooper's contention that its claim for unreasonable practices and rates is authorized under 49 U.S.C. § 13701 and 49 U.S.C. § 14701. As DBA correctly points out, § 13701 is inapplicable here as it relates to household goods transportation, water transportation, and rates made collectively by motor carriers. Section 14701 is also inapplicable as it addresses the Surface Transportation Board's (STB) authority to institute actions and authorizes private parties to file complaints with the STB. Cooper also cites to *Reiter v. Cooper*, 507 U.S. 258 (1993),

as support for the proposition that its unreasonable practices and tariff rate claim is authorized under ICCTA. *Reiter* stands for the rule that under the Interstate Commerce Act (ICA), a shipper may counterclaim asserting the unreasonableness of a tariff rate in an action by a motor carrier to collect on shipments made on behalf of the shipper. That case, however, was decided in 1993, prior to the enactment of ICCTA, which amended Subtitle IV of Title 49 of the ICA. In *Reiter*, the Court stated that 49 U.S.C. § 10701(a) "requires carriers' rates to be reasonable," 507 U.S. at 262; post-amendment, that code section concerns standards applicable to rail carriers.[3] Cooper fails to address the applicability of *Reiter* following amendment of the ICA. The statute Cooper does cite as authority that rates charged for transportation of goods must be reasonable—49 U.S.C. § 13701—applies only to household goods carriers, water carriers, and carriers collectively making rate agreements, as mentioned above.[4] Overall, Cooper provides no authority for the proposition that

---

[3] Pre-amendment, the code stated: "A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission . . . must be reasonable." 49 U.S.C. § 10701(a) (1988). Post-amendment, the code states: "A through route established by a rail carrier must be reasonable. Divisions of joint rates by rail carriers must be made without unreasonable discrimination against a participating carrier and must be reasonable." 49 U.S.C. § 10701(a) (2006).

[4] Cooper does not allege that 49 U.S.C. § 13711 applies to the factual scenario on hand.

ICCTA has a reasonable rate requirement for all motor carriers, which authorizes its unreasonableness claim. Accordingly, Cooper has failed to show that Count I is appropriately brought under ICCTA.

Lastly, Cooper argues that its claim for attorneys fees under O.C.G.A. § 13-6-11 is not preempted as the "Georgia statute is independent of and not related to the rates, prices, routes, or services for transportation" [Doc. No. 13, 9]. To recover under § 13-6-11, a plaintiff must show "bad faith connected with the transaction and dealings out of which the cause of action arose." *Monterrey Mexican Rest. Of Wise, Inc. v. Leon,* 282 Ga. App. 439, 451, 638 S.E.2d 879, 890 (2006). Here, a showing of bad faith would necessarily raise to the fore DBA's actions related to the price or service of transportation. A judgment for attorneys' fees against DBA would also represent the "impos[ition] [of a] state law() . . . external to any agreement between Plaintiff and Defendant on Defendant's conduct relating to its pricing practices." *Deerskin,* 927 F. Supp. at 672. To the extent it is based on DBA's bad faith related to the shipping transactions at issue, Cooper's claim for attorneys' fees fails. Section 13-6-11 also authorizes the recovery of attorneys' fees for stubborn litigiousness or for causing the plaintiff unnecessary trouble and expense. However, such recovery is permitted only where "the evidence reveals no bona fide

controversy or dispute with regard to the defendant's liability." *Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 157, 622 S.E.2d 481, 483 (2005). There is a bona fide dispute here. Accordingly, Cooper's claim for attorneys' fees also fails.

Overall, Cooper's unreasonable practices and tariff rate claim as well as its state-law based claims for a statutory violation and torts are DISMISSED. Cooper has also asserted a breach of contract claim; that claim is not before the Court on DBA's motion to dismiss and Cooper may proceed on that claim.

## IV. CONCLUSION

For the above mentioned reasons, Plaintiff's motion to dismiss Counterclaim Counts I through IV [Doc. No. 7] is **GRANTED**.

**SO ORDERED**, this <u>21st</u> day of September, 2012.

<u>s/Steve C. Jones</u>
STEVE C. JONES
United States District Judge

# EXHIBIT "2"

houn's conduct on September 6 was simply the proverbial straw that broke the camel's back.

Given this history of insubordinate behavior, Calhoun cannot show that UPS's decision to discharge him on September 7 for insubordination was pretext for discrimination. We therefore affirm the ARB's conclusion that Calhoun has failed to meet his burden under the "Complaint Clause," 49 U.S.C.A. §31105(a)(1)(A)(i), of proving that he was discharged for engaging in protected activity.

## IV.

For the foregoing reasons, we affirm the ARB's denial of Calhoun's complaint.

*AFFIRMED*

---

[¶ 84,624]   **ICU Investigations, Inc., Plaintiff-Appellant, v. Simonik Moving & Storage, Inc., Defendant-Respondent;**

Superior Court of New Jersey, Appellate Division, No. A-0629-08T2. Decided August 14, 2009.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County. Affirmed in part, reversed in part.

➤➤➤ *Caution: The court has designated this opinion as NOT FOR PUBLICATION. Please consult the Rules of the Court before citing this case*

**Interstate Commerce Commission Termination Act—Preemption—State law claims.—** A shipper's state law claims for consumer and common law fraud against a motor carrier engaged in the intrastate movement of property were preempted by the Interstate Commerce Commission Termination Act (ICCTA). The shipper had hired the carrier to move the contents of its office from its old location to a new location within the state of New Jersey. The carrier had estimated the cost of the move to be $2,500; however before the carrier delivered the property to the new location, it demanded an additional $800. The shipper filed suit against the carrier alleging state and common law fraud. The carrier sought a motion to dismiss the state law claims, arguing that they were preempted by the ICCTA. Under the ICCTA, a state is prohibited from enacting or enforcing a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier with respect to the transportation of property. The shipper challenged the carrier's preemption claim, arguing that the alleged bait-and-switch conduct did not relate to the carrier's "price, route or service of any motor carrier," and asserting that the ICCTA was not applicable to purely intrastate moves. Based on the statutory language and case law, the shipper's consumer fraud and common law fraud claims, were preempted by the ICCTA. Thus, the district court's dismissal of those claims was affirmed.

Back references.—¶ 2304; 2362; 2622; 2656.

**Interstate Commerce Commission Termination Act—Preemption—State law claims.—** A shipper's state law breach of contract claim against a motor carrier engaged in the intrastate movement of non-household goods property was not preempted by the Interstate Commerce Commission Termination Act (ICCTA). The shipper had hired the carrier to move the contents of its office from its old location to a new location in the state of New Jersey. The carrier had estimated the cost of the move to be $2,500; however before the carrier delivered the property to the new location it demanded an additional $800. The shipper filed suit against the carrier alleging breach of contract based on the carrier's failure to honor its own contractual obligations. The carrier sought a motion to dismiss the breach of contract claim, arguing that it was preempted by the ICCTA. Under the ICCTA, a state is prohibited from enacting or enforcing a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier with respect to the transportation of property. The shipper challenged the carrier's preemption claim, arguing that the U.S. Supreme Court had specifically held that federal transportation deregulations statutes do not preempt state law breach of contract actions. While the High Court did not hold that all breach of contract claims were exempted from federal preemption, it did find that routine breach of contract actions with no enlargement or enhancement based on state laws or policies external to the agreement were not subject to federal preemption. Accordingly, since the shipper's breach of contract claim was "routine" and had not alleged any violation of state-imposed obligations, it was not preempted by the ICCTA. Thus, the district court's dismissal of the shipper's breach of contract claim was reversed and remanded.

Back references.—¶ 2304; 2362; 2622; 2656.

Before Judges Axelrad, Messano and Kestin.

PER CURIAM:

Plaintiff ICU Investigations, Inc. (ICU) appeals from the trial court's ruling that its state

**60,112**  Court Decisions  1565  9-2009
*ICU Investigation v. Simonik Moving & Storage, Inc.*

law claims for consumer fraud; common-law fraud and breach of contract are preempted by the Interstate Commerce Commission Termination Act (ICCTA). We affirm in part and reverse in part.

On or about January 30, 2006, defendant Simonik Moving & Storage, Inc. (Simonik) provided ICU with a written "Estimated Costs of Services," which calculated an estimated cost of $2,500 for moving ICU's business office contents from its old location in Marlton to its new location in West Berlin. The document also contained a disclaimer, stating it was merely an estimate, and "[a]ll charges are subject to actual time plus travel or actual weight, whichever is applicable." The parties entered into a contract on or about March 30, 2006, for Simonik to move ICU on April 28, 2006.

On the scheduled move date, Simonik, appeared at ICU's Marlton office, loaded the contents onto its truck and moved the items as contracted to ICU's West Berlin office. According to ICU, it tendered a $2,500 check but Simonik demanded an additional $800 payment and its employees threatened to hold ICU's property in storage until that payment was tendered. Following a dispute as to the propriety of the additional charges, ICU's equipment was ultimately unloaded. ICU thereafter stopped payment on the $2,500 check.

ICU filed a complaint, followed by three amended complaints, eventually settling on class action claims for violation of the Public Movers and Warehousemen Licensing Act, *N.J.S.A.* 45:14D-1 to -29, and the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8-1 to -167; and individual claims for violation of the same two acts, as well as breach of contract and common law fraud.[1] The basis for ICU's class action CFA claim was that Simonik underestimated charges to potential customers to induce them—since Simonik for moving services, i.e. it underestimated the amount of time necessary to complete the move and the number of men to be used in the move, billed for a "supervisor" when such person was not included on the estimate; failed to disclose the fuel surcharge in the estimate and then imposed it before unloading the moved goods, and over-billed for the time of the move. ICU accused Simonik of "bait and switch" practices perpetuated upon customers with little leverage because their possessions were locked in a truck and would not be released until "specious and/or previously undisclosed charges" were paid. ICU asserted as an "ascertainable loss" that it was charged more money than estimated even though it had fewer items moved than were originally in the estimate, and it lost employee productivity when its employees unloaded the

moving vans after ICU's employees refused to continue. In its individual CFA claim, ICU further alleged Simonik wrongfully sought to increase the fees and costs before ICU's property was unloaded; retained ICU's goods when it refused to tender an additional payment; and refused to unload the truck, forcing ICU's personnel to do so, which damaged ICU in the form of lost productivity and benefit of the moving bargain.

ICU's breach of contract claim is premised on the same allegations. As to the fraud claim, ICU alleged it relied on Simonik's estimate to hire it as the "low bidder," the mover deliberately did not provide an accurate estimate so it could obtain the job and utilize the "power disparity" it obtained to impose additional fees when ICU's property was locked on the truck, and completed the fraud scheme by refusing to unload the truck and demanding additional fees. ICU sought compensatory and punitive damages on this count.

Simonik filed an answer and counterclaim to the third amended complaint on September 19, 2007. The counterclaim was dismissed with prejudice by order of August 18, 2008, which Simonik has not appealed.

On February 25, 2008, the court ordered ICU to file a motion for partial class certification by March 21, 2008. After the filing date came and went, Simonik, pursuant to a management conference, filed a motion to dismiss ICU's complaint as preempted by the ICCTA, specifically 49 U.S.C.A. §14501(c)(1). ICU filed opposition along with a cross-motion to extend discovery. Following oral argument, the court concluded the ICCTA did preempt each of ICU's state law causes of action, although the court allowed ICU's counsel a limited period of time to decide whether ICU would amend its complaint to add a cause of action for the limited civil remedies afforded under the ICCTA. See, e.g., 49 U.S.C.A. §14705(b) (permitting recovery of overcharges against a carrier). Following a dialogue between the court and counsel, it was decided that ICU would not amend its complaint and the complaint and counterclaim would thus be dismissed with prejudice. The court entered an order to that effect on August 18, 2008. This appeal ensued.

On appeal, ICU argues the trial court erred by concluding the ICCTA preempted its CFA, common law fraud and breach of contract claims because: (1) the statute expressly provides that its civil remedies are in addition to state law remedies, 49 U.S.C.A. §13103; (2) the type of bait-and-switch conduct as occurred here is unrelated to the "price, route or service of

[1] It appears from the motion transcript that ICU abandoned its Public Movers Act claim as preempted by federal

law. ICU's appeal deals solely with its Consumer Fraud Act, common law fraud and breach of contract claims.

©2009 CCH. All Rights Reserved.

¶ 84,624

any motor carrier" preempted by 49 U.S.C.A. § 14501(c)(1) as interpreted by the case law; (3) the United State Supreme Court has specifically held that federal transportation deregulation statutes do not preempt state law breach of contract actions, Am. Airlines v. Wolens, 513 U.S. 219, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995); and, (4) the statute defines its jurisdiction to exclude purely intrastate moves, such as the one at issue here, 49 U.S.C.A. § 13501.

Simonik counters that Congress and the federal and state courts have all concluded that the type of claims asserted by ICU in its complaint, which arise from the intrastate transportation of non-household goods, are either expressly or, by implication preempted by federal law. According to Simonik, like the statutory provisions pertaining to the airline, railroad and water carrier industries, the ICCTA provision applying to the motor carrier industry unambiguously prohibits States from enacting or enforcing laws and/or regulations "related to the price, route, or service of any motor carrier" with respect to the intrastate transportation of non-household goods,". 49. U.S.C.A. § 14501(c)(1),. (2)(B), Simonik emphasizes that this provision has been interpreted broadly to preempt virtually all varieties of State claims. The reasoning behind these interpretations is that the regulation, as achieved through the federal government's power to preempt state law, serves the dual purpose of avoiding conflicting rules of substantive law in an industry where uniformity is essential, while promoting efficiency by leaving control of as many aspects of the industry as possible to the competitive marketplace. Accordingly, Simonik contends the trial court correctly concluded that ICU's claims fell within the preemptive scope of the "related to" language of Section 14501 and properly dismissed ICU's complaint in its entirety, with prejudice.

**1.**

When an appellate court is reviewing issues that are purely legal in nature, such review is de novo, and no deference need be shown to the trial court's interpretation of the law. Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995).

A court's primary goal when interpreting a statute is to determine the legislature's intent. O'Connell v. State, 171 N.J. 484, 488 (2002). A court examines intent by first looking to the plain language of the statute, Ibid. ("[a] court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language"), assigning the common law definitions of statutory terms unless evidence exists that Congress intended otherwise, see United States v. Shabani, 513 U.S. 10, 13, 130 L. Ed. 2d 225, 229, 115 S.

Ct. 382, 384, (1994). However, if a court concludes the statutory language is ambiguous and there is more than one plausible interpretation, it may look to extrinsic evidence, including the legislative history of the statute, Burnett v. County of Bergen, 198 N.J. 408, 421 (2009) (internal citations omitted). Courts may also do so if a plain reading of the statute leads to an absurd result. Ibid. "It is well-established that statutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole." Bedford v. Riello, 195 N.J. 210, 224 (2008).

The preemptive effect of the ICCTA on ICU's causes of action is best understood by examining the context in which Congress enacted the statute and the interpretations courts have afforded the ICCTA and related statutes over the years. We thus provide a brief recitation of the legislative and judicial history of the ICCTA:

Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, state laws that, "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution", are invalid.". Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604, 111 S. Ct. 2476, 2481, 115 L. Ed. 2d 532, 542 (1991) (quoting Gibbons v. Ogden, 22 U.S. 1, 211; 6 L. Ed. 23, 73 (1824)). Thus, "when the mandates of federal law and state law are not consistent, the state law must yield." Feldman v. Lederle Lab., 125 N.J. 117, 133 (1991); cert. denied, Lederle Lab. v. Feldman, 505 U.S. 1219, 112 S. Ct. 3027, 120 L. Ed. 2d 898 (1992). The preemption doctrine applies equally to common law and state statutory law. Id. at 134.

"Federal preemption of a state law is not to be presumed lightly, however, and the State's police powers are not to be superseded by federal law unless clearly required by Congress. Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp., 163 N.J. 446, 453 (2000). "The primary source of Congress' intent is the language of the preemptive statute and the statutory framework surrounding it." Ibid; see also FMC Corp. v. Holliday, 498 U.S. 52, 56, 111 S. Ct. 403, 407, 112 L. Ed. 2d 356, 363 (1990). Absent explicit language, courts may infer congressional intent "from the pervasiveness of the federal regulatory scheme." Vail v. Pan Am Corp., 260 N.J. Super. 292, 297 (App. Div. 1992). The United States Supreme Court's interpretation of a federal statute is controlling. See generally Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 79 (1990).

Congress passed the Interstate Commerce Act in 1887 and created the Interstate Commerce Commission (ICC), whose initial purpose was to regulate railroad transportation. Grafton & Upton R.R. Co. v. Town of Milford, 337 F. Supp. 2d 233, 237 (Mass. Dist. Ct. 2004). Over

the ensuing years, Congress broadened the ICC's jurisdiction to include regulatory authority over almost all common carriers, including busing companies and interstate telephone companies. *See generally* James P. Speta, *A Common Carrier Approach to Internet Connection,* 54 *Fed. Comm. L.J.* 225 (2002). In 1935, Congress passed the Motor Carrier Act, placing the highway motor carrier industry under ICC oversight and conferring upon the agency the authority to, among other powers, regulate hours of service, control operating permits, approve trucking routes, and set tariffs. *See generally Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,* 494 F.3d 188, 193 (D.C. Cir. 2007); *In Re Olympia Holding Corp.,* 88 F.3d 952, 955 (11th Cir. 1996).

Beginning in the 1970s, Congress began deregulating common carriers, commencing with the railroad industry in 1976. *See* Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94-210, 90 Stat. 31 (codified as amended at scattered sections of 49 U.S.C.A.). Two years later, Congress "determine[ed] that 'maximum reliance on competitive market forces,'" as opposed to regulation, would favor "lower airline fares and improve service," and enacted the Airline Deregulation Act of 1978 (ADA), Pub.L. No. 95-504, 92 Stat. 1705 (1978) (codified at 49 U.S.C.A. App. §§1301-1557); *Morales v. Trans World Airlines,* 504 U.S. 374, 378, 112 S. Ct. 2031, 2034, 119 L. Ed. 2d 157, 164 (1992) (internal citations omitted). To ensure the states would not undermine the federal regulation scheme with their own regulations, the ADA included a specific preemption provision prohibiting the states from enacting or enforcing "any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier." 49 U.S.C.A. §1305(a)(1).[2] *Morales, supra,* 504 U.S. at 383, 112 S. Ct. at 2037, 119 L. Ed. 2d at 167. The ADA retained the Civil Aeronautics Board's authority over deceptive trade practices, which was later transferred to the Department of Transportation, but preserved the saving clause in the prior laws, which provided that nothing in the ADA would abridge or alter the common law or statutory remedies and that the provisions of the chapter were in addition to "such remedies. *Vail, supra,* 260 *N.J. Super.* at 295-96.

In 1980, Congress deregulated trucking. *See* Motor Carrier Act of 1980, Pub.L. 96-296, 94 Stat. 793 (1980). In 1994, Congress similarly

sought to preempt state trucking regulation. *See* Federal Aviation Administration Authorization Act of 1994 (FAAAA), 103 Pub.L. 305, 108 Stat. 1605-1606 (1994). In the FAAAA, Congress borrowed the preemption language from the ADA and applied it to combined motor-air carriers. 49 U.S.C.A. §41713(b)(4)(A).

In 1995, in an effort to deregulate, in substantial part, the railroads and other modes of surface transportation, Congress enacted the ICCTA, effective January 1, 1996, abolished the ICC and transferred its rail and non-rail regulation functions to the newly-created Surface Transportation Board (Board), within the Department of Transportation. 49 U.S.C.A. §§701-727; §§10101-16106; *see also Grafton, supra,* 337 F. Supp. 2d at 237-38; *Ridgefield Park, supra,* 163 N.J. at 453. As in the FAAAA, Congress also used the preemption language of the ADA, that "a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C.A. §14501(c)(1).

The United States Supreme Court analyzed the ADA's preemption language in two major cases. In 1992, it decided *Morales, supra,* in which it held that guidelines promulgated by the states aimed at curtailing deceptive airline-fare advertisements and enforced by states' attorneys general through their respective state consumer fraud states were expressly preempted as within the "relating to rates, routes, or services" language of Section 1305(a)(1), 504 U.S. at 388-91, 112 S. Ct. at 2039-41, 119 L. Ed. 2d at 170-72. The Court rejected the argument that the provision only preempted states from actually prescribing rates, routes, or services, reasoning that this interpretation would read the words "relating to" out of the statute and if Congress intended such limited preemption, it would have forbidden the States to "regulate rates, routes, and services." *Id.,* at 385, 112 S. Ct. at 2038, 119 L. Ed. 2d at 168. The Court further noted that the ordinary meaning of the phrase "relating to" is a broad one, having a dictionary definition of "having a connection with, or reference to." *Id.* at 383-84, 112 S. Ct. at 2037; 119 L. Ed. 2d at 167.

For aid in construing the ADA phrase, the Court referred to a similar preemption provision in the Employment Retirement Security Act of 1974 (ERISA) and noted several cases in which the Court gave the words "relating to" liberal meaning.[3] *Id.* at 383-84, 112 S. Ct. at 2036-37,

---

[2] In 1994, Congress re-codified the ADA's preemption provision at 49 U.S.C.A. §41713(b)(1), but did not substantively change it.

[3] The ERISA statute provides for preemption of state laws "insofar as they . . . relate to any employment benefit plan." 29 U.S.C.A. §1144(a). The Court held a state law

"relate[s] to" an employment benefit plan, and is thus preempted by ERISA, "if it has a connection with or reference to such a plan." *Morales, supra,* 504 U.S. at 383-84, 112 S. Ct. at 2037, 119 L. Ed. 2d at 167 (citations omitted).

©2009 CCH. All Rights Reserved.

1565  9-2009                Cited 2008—2009 Federal Carriers Cases
                      ICU Investigation v. Simonik Moving & Storage, Inc.

60,115

119 L. Ed. 2d at 167-68. The Court analogously defined the "relating to" language in the ADA preemption clause and held that state enforcement actions "having a connection with, or reference to" airline carrier "rates, routes, or services" are pre-empted. Id. at 384, 112 S. Ct. at 2037, 119 L. Ed. 2d at 167-68.

The Court further held preemption may occur even if a state law's effect on rates, routes or services "is only indirect"; respecting preemption, it is immaterial whether a state law is "consistent" or "inconsistent" with federal regulation; and preemption occurs at least where state laws have a "significant impact" related to Congress' regulatory and preemption-related objectives. Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. —, —, 128 S. Ct. 989, 995, 169 L. Ed. 2d 933, 939 (2008) (internal citations omitted). It did note, however, that federal law might not preempt state laws that affect fares in only a "tenuous, remote, or peripheral . . . manner," such as state laws forbidding gambling. Id. at —, 128 S. Ct. at 995, 169 L. Ed. 2d at 939-40.

Morales also addressed the FAAAA saving clause, which preserved "the remedies now existing at common law or by statute," and concluded the clause was a "relic of the pre-ADA/ no preemption regime." Id. at 384-85, 112 S. Ct. at 2037, 119 L. Ed. 2d at 168. The Court applied the "commonplace" statutory construction principle that the specific governs the general, concluding "[a] general 'remedies' saving clause cannot be allowed to supersede the specific substantive preemption provision" of §1305(a)(1), Ibid.

The Court again analyzed the ADA's preemption clause in 1995 in Wolens, supra, in which it decided whether Illinois class action consumer fraud and breach of contract claims regarding an airline's retroactive changes to its frequent flyer program were preempted under the ADA. 513 U.S. at 221-22, 115 S. Ct. at 820, 130 L. Ed. 2d at 721. The Supreme Court concluded that the plaintiffs' consumer fraud claims were substantially similar to those asserted in Morales, and thus preempted by Section 1305(a)(1). Id. at 228, 115 S. Ct. at 823, 130 L. Ed. 2d at 725. The Court expressly noted the "ADA's purpose to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services," and the DOT's retention of authority to investigate unfair and deceptive practices and unfair methods of competition by airlines and to order an airline to cease and desist therefrom. Ibid.

The Court held, however, that routine breach of contract actions with no enlargement or enhancement based on state laws or policies external to the agreement are not preempted by the ADA, and it permitted the plaintiffs' breach of

contract claims to proceed. Id. at 228-33, 115 S. Ct. at 824-26, 130 L. Ed. 2d at 725-28. The Court did "not read the ADA's preemption clause . . . to shelter airlines from suits alleging no violation of state-imposed obligations, [and did not shield them from suits] seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." Id. at 228, 115 S. Ct. at 824, 130 L. Ed. 2d at 725-26.

As the Court explained, the terms and conditions offered by the airlines and accepted by the passengers are "privately ordered obligations" and do not amount to state-imposed laws, rules, or other standards having the force and effect of law within the meaning of the ADA's preemption provision. Id. at 228-29, 115 S. Ct. at 824, 130 L. Ed. 2d at 726. The Court elaborated: "A remedy confined to a contract's terms simply holds parties to their agreements—in this instance, to business judgments an airline made public about its rates and services." Id. at 229, 115 S. Ct. at 824, 130 L. Ed. 2d at 726. This is particularly the case, the court noted, since the ADA contains the word series "law, rule, regulation, standard, or other provision," which connotes official government policies rather than private contracts. Id. at 229 n. 5, 115 S. Ct. at 824 n. 5, 130 L. Ed. 2d at 726 n. 5 (quoting 49 U.S.C.A. §1305(a)(1)).

The Court then looked to Congress' intent in creating the ADA, and, contrasting the ERISA, explicitly channeling civil actions into federal courts, determined that Congress did not seek "to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes, or services [as] [the ADA contains no hint of such a role for the federal courts," Id. at 232, 115 S. Ct. at 825, 130 L. Ed. 2d at 728. The Court further reasoned that the ADA's preemption clause, read together with its saving clause, precluded states from imposing their own substantive standards regarding rates, routes, or services but did not preclude a party's ability to seek relief for an airline's violation of a term stipulated by the airline itself, Id. at 232, 115 S. Ct. at 826, 130 L. Ed. 2d at 728.

In 2008, in Rowe, supra, the Supreme Court analyzed similar preemption language contained in 49 U.S.C.A. §14501(c)(1) as it applies to motor carriers. 522 U.S. —, 128 S. Ct. 989, 169 L. Ed. 2d 933. The decision in Rowe was the impetus for Simonik's motion. In that case, the Court examined whether federal law precluded two provisions of a Maine law, which regulated the delivery of tobacco to customers within the state by requiring shippers to utilize a specific delivery service with a mechanism confirming the buyer is of legal age and forbade anyone other than Maine-licensed tobacco retailers from

**60,116**

Court Decisions

*ICU Investigation v. Simonik Moving & Storage, Inc.*

1565   9-2009

sending or receiving tobacco. *Id.* at —, 128 S. Ct. at 993-94, 169 L. Ed. 2d at 938.

The Court began with the well-established principle that "where judicial interpretations have given settled meaning to an existing statutory provision, repetition of the same language in a new statute indicates the intent to incorporate its judicial interpretation as well." *Id.* at —, 128 S. Ct. at 994, 169 L. Ed. 2d at 939. Because the FAAAA and the ICCTA were enacted subsequent to *Morales*, which settled the meaning of the express preemption provision in the ADA, and because Congress used the same language as the air carrier preemption provision of the ADA in the FAAAA and the ICCTA fully aware of the Supreme Court's interpretation of the former language as set forth in *Morales*, the Court concluded that the judiciary should construe the preemptive provisions in the subsequent Acts just as broadly and literally as it had always construed the same provision in the ADA. *Ibid.* The Court stated; "[G]iven *Morales*, where the Court held that federal law pre-empts state consumer-protection laws, we find that federal law must also pre-empt Maine's efforts directly to regulate carrier services." *Id.* at —, 128 S. Ct. at 998, 169 L. Ed. 2d at 943.

Using the four-part rule from *Morales* as a roadmap, the Court observed that the Maine statute forbade licensed tobacco retailers from employing a delivery service unless that service followed particular delivery procedures and in doing so, focused on trucking and other motor carriers, thereby creating a direct "connection with" motor carrier services. *Id.* at —, 128 S. Ct. at 995, 169 L. Ed. 2d at 940. The law also had a significant impact on the federal statute's ability to achieve its preemption-related objectives, as it required carriers to offer a system of services that the market did not provide and which the carriers would prefer not to offer, effectively substituting state governmental commands for the competitive market forces sought to be achieved through preemption. *Id.* at —, 128 S. Ct. at 996, 169 L. Ed. 2d at 941. The Court further concluded that Maine's regulatory patchwork requiring a special checking system of every shipped tobacco package was inconsistent with Congress' legislative effort to leave the essential details of a motor carrier's system for picking up, sorting and carrying goods, where federally unregulated, to the competitive marketplace. *Id.* at —, 128 S. Ct. at 996, 169 L. Ed. 2d at 941.

**II.**

We turn now to an analysis of the case on appeal. The relevant provisions of Section 14501, "Federal authority over intrastate transportation," state:

(c) Motor carriers of property.—

(1) General rule.—Except as provided in paragraphs (2) and (3), a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

(2) Matters not covered.—Paragraph (1)—

. . . .

(B) does not apply to the intrastate transportation of household goods. . . .

[49 U.S.C.A. § 14501.]

The general "saving clause," Section 13101, "Remedies as cumulative," provides:

Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law.

[49 U.S.C.A. § 13103.]

We summarily dispose of ICU's argument that the general cumulative remedies saving clause can be read independently to trump the specific substantive preemption provision of Section 14501. Such an interpretation would be unsupported by the express operative language of the statute ("Except as otherwise provided in this part"), longstanding principles of statutory construction and the express analysis of the United States Supreme Court. *See Morales*, *supra*, 504 U.S. at 384-85, 112 S. Ct. at 2037, 119 L. Ed. 2d at 168; *see also Wolens*, *supra*, 513 U.S. at 232, 115 S. Ct. at 826, 130 L. Ed. 2d at 728; *Vail*, *supra*, 260 N.J. Super. at 298.

Based on our analysis of the statutory language and case law, we are satisfied ICU's CFA and common-law fraud claims are preempted by Section 14501(c)(1), as they "relate to a price, route, or service of any motor carrier" involved in the intrastate transportation of non-household goods. Accordingly, we affirm the trial court's dismissal of these claims. We are not persuaded, however, that ICU's "routine" breach of contract claim, which alleges no violation of state-imposed obligations, is preempted and we thus reverse that portion of the court's ruling, and remand for ICU's breach of contract claim to proceed.[4]

The New Jersey CFA states:

---

[4] Simonik alternatively argues that even if we hold that *Wolens* did save ICU's contract claim from preemption, we should exercise original jurisdiction, R. 2:10-5, and dismiss this count on the grounds that ICU cannot claim any

damages arising from Simonik's alleged breach of contract as it stopped payment of its $2,500 check (the amount of the estimate) after delivery of its goods to its new office and thus did not pay for the services rendered. We decline to do

¶ 84,624

©2009 CCH. All Rights Reserved.

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . , or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . .

[N.J.S.A. 56:8-2.]

New Jersey has expressed a clear intent, codified into consumer protection legislation, to regulate potentially unconscionable commercial practices and deceptive advertising to prevent fraud, similar to the Illinois CFA in *Wolens*. Allowing such a claim to proceed in state court would run counter to the holdings in *Morales*, *Wolens* and *Rowe* that federal law preempts state consumer protection laws as applicable to motor carrier services. Moreover, ICU's narrow interpretation of Section 14501 as preempting the states, solely, from prescribing rates, routes, and service would fly in the face of the broad interpretation the Supreme Court gave in those cases to the "relating to" language of the preemption statutes.

We are satisfied that ICU's claims as asserted in its CFA counts "relat[e] to" the motor carrier's prices and services, specifically, as they challenge items such as the fuel surcharge, the particulars of the estimate and the amount of time and labor associated with the move as evidence of Simonik's alleged unconscionable commercial practice of intentionally underestimating charges to induce a customer to hire it. Allowing ICU's CFA claim to proceed would also have a "significant impact" on Congress' intent to deregulate motor carriers since the CFA provides additional regulation, not less, and such regulation could impinge on the competitive marketplace.

Despite the public welfare considerations and salutary purpose of the CFA, we cannot agree with ICU that federal law creates an exception on that basis to exempt state laws it would otherwise preempt. Where Congress has determined to preempt a field, state regulation is precluded regardless of the "public good" it purports to serve. The ICCTA explicitly lists exceptions in Section 14501, i.e., matters not covered,

and says nothing about a consumer protection exception. The Maine statute at issue in *Rowe* was enacted for a public purpose no less important—the prevention of the sale of tobacco to minors—but in deeming the measure preempted by the ICCTA, the United States Supreme Court found the state law objective immaterial. *Rowe,* supra, 552 U.S. at ——, 128 S. Ct. at 996-97, 169 L. Ed. 2d at 941. While it may seem anomalous to ICU that it is unable to pursue its CFA claim, the reality is that many matters of public importance are subject not only to federal preemption, but also to State preemption. See, e.g., *G.H. v. Twp. of Galloway*, 199 N.J. 135 (2009) (municipal ordinance prohibiting convicted sex offenders from living within designated distance of schools, park, playgrounds and daycare centers preempted by New Jersey's Megan's Law); *S. Ocean Landfill, Inc. v. Mayor and Council of Ocean Twp.*, 64 N.J. 190 (1974) (municipal landfill regulatory ordinance banning deposit of sewerage, septic or cesspool material preempted by New Jersey's Solid Waste Management Act); *Tumino v. Long Beach Twp.*, 319 N.J. Super. 514 (App.Div. 1999) (municipality's decision to deny the plaintiff's application to replace a dock on grounds that it would pose a safety hazard invalidated as preempted by New Jersey's Waterfront Development Act).

That the civil remedies available under the ICCTA are less extensive than those available under the CFA, [5] and that ICU will be left without an equivalent remedy for potential consumer fraud violations may not be used as arguments to avoid federal preemption, since it is well established that Congress, if it explicitly chooses, may, under the doctrine of complete preemption, supersede not only state substantive law, but also state causes of action. See, e.g., *Caterpillar, Inc v. Williams*, 482 U.S. 386, 393, 107 S. Ct. 2425, 2430, 96 L. Ed. 2d 318, 328 (1987). Moreover, the possibility a plaintiff may lack a remedy due to preemption "is consistent with the meaning of the pre-emption doctrine. The fact that a plaintiff is without remedy does not mean that Congress has not addressed the issue. On the contrary, it merely shows that Congress has weighed the matter and struck the balance in defendant's favor." *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F. Supp. 278, 288 (D.N.J. 1994).

We are also not convinced by ICU's argument that Congress' omission of solely intrastate transportation by motor carriers of passengers and/or property as within the general jurisdic-

(Footnote Continued)

so, and leave Simonik to pursue the relief it deems appropriate on remand.

[5] For example, the ICCTA prohibits a motor carrier from presenting "false or misleading information on a document about the actual rate," sets forth procedures for resolving

claims for disputed charges, provides for enforcement of violations of the Act by the Secretary or the Board on the Attorney General, and permits civil actions by the injured party. 49 U.S.C.A. §§ 13708, 13709, 13710, 14701-14711.

**60,118**                    Court Decisions                    1565   9-2009
*ICU Investigation v. Simonik Moving & Storage, Inc.*

tion of the Secretary and the Board; 49 U.S.C.A. § 13501, [6] evidenced an intent to allow state enforcement of statutes such as the CFA for claims arising out of ICU's move from Marlton to West Berlin. Applying the basic tenet of statutory construction that statutes must be read in their entirety and construed together to provide a harmonious whole, *see Bedford, supra,* 195 N.J. at 224, we must read Sections 13501 and 14501 in conjunction with one another. Section 13501 addresses in general terms what the federal agency can regulate; it does not state the list is exhaustive. Congress, however, expressly provided in Section 14501(c)(B) that the federal preemption does not apply to the "intrastate transportation of household goods"; thus, it is reasonable to conclude that Congress implicitly intended to include within the preemption intrastate transportation of non-household goods, such as ICU's office goods moved by Simonik.

ICU's common law fraud cause of action is premised on the same core operative set of facts as its CFA claim, i.e., inaccurately disclosing and underestimating the charges to obtain the job and attempting to hold the cargo hostage to procure an additional fee, with the relief sought of compensatory and punitive damages. It is therefore clearly related to the price, route or service of a motor carrier. *Morales and Wolens* make it clear that ICU's common law fraud claim is also preempted. *See Wolens, supra,* 513 U.S. at 227-28, 115 S. Ct. at 823-24, 130 L. Ed. 2d at 724-26; *Morales, supra,* 504 U.S. at 384, 112 S. Ct. at 2037, 119 L. Ed. 2d at 167-68; *see also Vail, supra,* 260 N.J. Super. at 294.

Finally, we address ICU's breach of contract claim. Contrary to ICU's assertion, *Wolens* did not establish the wholesale proposition that all breach of contract claims involving airlines, or by extrapolation motor carriers, are saved from federal preemption. Rather, the Supreme Court held that only routine breach of contract actions with no enlargement or enhancement based on state laws or policies external to the agreement are not preempted by the federal statute. *Wolens, supra,* 513 U.S. at 228-33, 115 S. Ct. at 824-26, 130 L. Ed. 2d at 725-28. Thus, where the contract claim alleges "no violation of state-imposed obligations" and a party is seeking re-

covery solely for the motor carrier's alleged breach of its "own, self-imposed undertakings," the claim may proceed in state court. *Id.* at 228, 115 S. Ct. at 824, 130 L. Ed. 2d at 725-26.

Based on our review of ICU's complaint, we are satisfied that its claim for breach of contract concerns the very "privately ordered obligation[]" that the Court explained does not "constitute a state-imposed law, rule or other standard having the force and effect of a law as intended by the ADA," or by analogy, the ICCTA. *See Wolens, supra,* 513 U.S. at 228-29, 115 S. Ct. at 824, 130 L. Ed. 2d at 726. ICU's claim deals specifically with Simonik's failure to uphold its own contractual terms regarding the price of ICU's move. This claim is thus not an attempt to use the common law to regulate motor carriers as an industry, but the remedy sought is confined to holding Simonik to "business judgments" about its rates and services. *Id.* at 229, 115 S. Ct. at 824, 130 L. Ed. 2d at 726.

We find unpersuasive Simonik's argument that our holding in *Vail* supports a contrary determination. In *Vail,* the plaintiffs sued Pan Am World Airways in a putative class action based on allegations that from 1986 through 1989, the airline advertised it was initiating an "enhanced security program" and fraudulently charged $5 per ticket to defray the cost of the program. *Vail, supra,* 26 N.J. Super. at 295. The plaintiffs claimed to have purchased their tickets unaware of the $5 charge and alleged the airline never instituted the program, filing CFA, fraud and breach of contract claims. *Id.* at 294-95. We found *Morales* dispositive and upheld the dismissal of the complaint on the grounds all of plaintiffs' claims "related to" the prices, routes, or services of an air carrier. *Id.* at 294, 299. Simonik submits the basis of ICU's contract claim is similar in that it alleges the additional charges associated with fuel and additional manpower were not disclosed and, based on the same rationale, ICU's contract claim should be preempted. We disagree. We clearly stated in *Vail* that we based our decision on *Morales, Id.* at 299, and, as *Vail* predated the *Wolens* decision, we did not have the benefit of the Supreme Court's analysis in that case. Accordingly, we did not differentiate between the

---

[6] Section 13501 provides that the Secretary and Board have "jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—

(1) between a place in—

(A) a State and a place in another State;

(B) a State and another place in the same State through another State;

(C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;

(D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or

(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and

(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

[49 U.S.C.A. § 13501.]

---

¶ **84,624**

©2009 CCH. All Rights Reserved.

fraud and contract claims in our preemption analysis. Therefore, even assuming Vail and the present case are factually similar, about which we have our doubts, we do not regard Vail as persuasive authority regarding the breach of contract preemption issue.

Affirmed as to the dismissal of ICU's CFA and common law fraud claims; reversed and remanded as to ICU's breach of contract claim.

---

**[¶ 84,625] Foam Fair Industries, Inc., Plaintiff, v. J.K. Hackl Transportation Services, Inc., et al., Defendants.**

**, U.S. District Court, District of New Jersey, Camden Vicinage, Civil No. 08-3205 (RMB), Dated August 28, 2009**

**»»»→ Caution: The court has designated this opinion as NOT FOR PUBLICATION. Please consult the Rules of the Court before citing this case.**

**Carmack Amendment—Minimum filing requirements—Claims for specific damages.—** A fax from a shipper containing price quotes for repairs to a machine damaged during interstate transportation satisfied the minimum claim filing requirements established by federal transportation regulations. Under the Carmack Amendment, a damage claim must meet certain minimum requirements. The claim must be in writing, state facts identifying the shipment and the damaged goods, assert liability for damages against the carrier, and request a specific and determinable amount of money damages. Nonetheless, certain jurisdiction have not required strict compliance with these requirements, finding that a claim meets the notice requirements if it is in writing and provides the carrier with enough information to conduct a prompt and complete investigation of the claim. Based on this analysis, the shipper's fax was found to have satisfied the minimum filing requirements because it identified the damaged goods, and provided an itemized cost estimate. The carrier challenged this finding, arguing that the fax failed to assert liability against the carrier or demand payment of a specific amount of damages. The carrier's arguments failed because the fax clearly was seeking payment for the damaged goods from the carrier and its insurer and the damage estimates provided sufficient evidence from which a specific demand for money damages could be inferred. Thus, the shipper was found to have substantially complied with the claim filing and notice requirements for damage claims under the Carmack Amendment.

Back references.—¶ 2657; 11,663.

## OPINION

Bumb, *District Judge:* This matter comes before the Court upon motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), brought by the defendant, J.K. Hackl Transportation Services, Inc., ("Defendant Hackl") and the Plaintiff, Foam Fair Industries, Inc., (the "Plaintiff"). This lawsuit arose from the delivery of damaged goods to Plaintiff by Defendant Hackl, a motor carrier. The issue now before the Court is whether, in accordance with the Carmack Amendment, 49 U.S.C. § 14706, its implementing regulations, 49 C.F.R. § 1005.2, and the operative bill of lading, Plaintiff discharged its duty to notify Defendant Hackl of its claim to recover for the damaged goods, which is a precondition to filing suit. For the reasons stated herein, the Court holds that Plaintiff did discharge its duty to notify Defendant Hackl of its claim. Accordingly, the motion for summary judgment by Defendant Hackl will be denied, and the motion for summary judgment by Plaintiff will be granted in part.

## LEGAL STANDARD

Summary judgment shall be granted if there is no genuine issue as to any material fact and

the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir. 1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "At the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "In making this determination, a court must make all reasonable inferences in favor of the non-movant." *Oscar Mayer Corp. v. Mincing Trading Corp.,* 744 F. Supp. 79, 81 (D.N.J. 1990) (citing *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir. 1983)). However, "the party opposing summary judgment 'may not rest upon the mere allegations or denials of the ... pleading'; its response, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" *Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir. 2001) (quoting Fed.R.Civ.P. 56(e)).